IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § CASE NO. 4:25-cr-00336-1 |
| | § HOUSTON, TEXAS |
| VERSUS | § FRIDAY, |
| | § AUGUST 1, 2025 |
| TYLER JOHN JORDAN | § 10:37 A.M. TO 11:06 A.M. |

**<u>DETENTION HEARING</u>**

BEFORE THE HONORABLE RICHARD W. BENNETT
UNITED STATES MAGISTRATE JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| CASE MANAGER: | SHANNON JONES |
| ELECTRONIC RECORDING OFFICER: | BRAD WILLIAMS |

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES (VIA ZOOM)**:


For the Government:                     DOJ-USAO
                                        DEPARTMENT OF JUSTICE
                                        Anhkhoa Thien Tran, Esq.
                                        1000 Louisiana Street
                                        Suite 2300
                                        Houston, TEXAS 77002
                                        713-567-9551


For the Defendant:                      FEDERAL PUBLIC DEFENDER
                                        Phillip Gallagher, Esq.
                                        440 Louisiana Street
                                        Suite 1350
                                        Houston, TEXAS 77002
                                        713-718-4600


Also Present:                           Marques Nelson

3

## **INDEX**

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MARQUES NELSON | | | | |
| By Mr. Tran | 4 | . | . | . |
| By Mr. Gallagher | . | 15 | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| (None offered.) | | | |

**\*\*\***

**HOUSTON, TEXAS; FRIDAY, AUGUST 1, 2025; 10:37 A.M.**

(Official Interpreter utilized for translation.)

THE COURT:  Court calls United States versus Tyler John Jordan, 4:25-cr-336.

MR. TRAN:  Khoa Tran, for the United States, Your Honor.

MR. GALLAGHER:  And Phillip Gallagher, for Mr. Jordan, present and ready.

THE COURT:  All right.  We are here on detention hearing.  Can you report on that?

MR. GALLAGHER:  Yes, Your Honor.

THE COURT:  Okay.  And what's the basis for detention again?

MR. TRAN:  Your Honor, it's 3142(f)(1)(E).  It's a firearm case.  And also 3142(f)(2)(A), serious risk of flight.

THE COURT:  Government ready to proceed?

MR. TRAN:  Yes, Your Honor.

THE COURT:  All right.  Call your first witness.

MR. TRAN:  Government calls Special Agent Marques Nelson with the FBI.

(Witness sworn.)

MR. TRAN:  May I begin, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. TRAN:

Q    Special Agent Nelson, can you -- I think I've already said it, but can you tell the Court what agency you work with?

A    The FBI.

Q    And how long have you been employed with the FBI?

A    For three years.

Q    And what section do you work with the FBI?

A    Violent crimes.

Q    All right.  And how did you become familiar with the facts of the case involving Defendant Tyler Jordan?

A    I spoke to the lead investigator and reviewed reports and videos.

Q    Okay.  So you're not involved in the investigation of this case, are you?

A    That's correct.

Q    Okay.  And can you tell the Court what happened on March 16, 2025?

A    Yes.  On March 16th, 2025, at a McDonald's, in Katy, Texas, you'll see on the video -- well, not anymore, not the video.  But there's a group of five individuals that walk inside of McDonald's, looks like to order food.

Then you'll see another group of three individuals to include the Defendant, walk inside.  An altercation then commenced for a fistfight.  One individual in the first group of five people pulled out a pistol.

Then another individual in the second group that walked

in pulled out a firearm.  Weapons were pointed at each other.  Both individuals shot at each other.

The individual in group two, that second group that came in, fired the gun and it was observed to be a machine gun.  All the bullets flew out of the gun that one --

Q    That's fine.

A    Sorry.

Q    Can you slow down a little bit?

A    Yes, sir.

THE COURT:  You said the second group of people, someone fired a machine gun?

THE WITNESS:  Yeah, so the last one, yes, it's a pistol that had a machine gun conversion device on it.  And so therefore, a fully automatic firearm.

THE COURT:  Slow down --

THE WITNESS:  Oh, no, I'm sorry.

THE COURT:  -- just a little bit.

THE WITNESS:  Yes, sir.  It's a fully automatic firearm that was fired.

THE COURT:  A what firearm?

THE WITNESS:  A fully automatic firearm.

THE COURT:  Okay.  Go ahead.

BY MR. TRAN:

Q    So let's just take it in chunks.  So there's a group of five individuals at the McDonald's before -- that was already

in the McDonald's; is that right?

A    That's correct.

Q    And then a group of three individuals walk in afterwards?

A    That's correct.

Q    And Mr. Jordan was a part of that second group; is that right?

A    Yes, sir.

Q    Is that right, in the video you see a first person walk in who officers -- well, Mr. Jordan identifies by the name of JJ?

A    That's correct.

Q    And then Jordan is the second person, Mr. Jordan's the second person that walks in; is that right?

A    Yes, sir.

Q    And then he holds the door open for a third person to come in; is that right?

A    That's correct.

Q    And the third person -- who's the third person?

A    Antone Ridge.

Q    Okay.  And what does Mr. Ridge do?

A    Mr. Ridge comes in the McDonald's, notices the fight happening, sees a gun pointed at him from the other side of the McDonald's, pulls out the weapon and fires the weapon at the individuals inside of McDonald's.

Q    And Mr. Ridge is the one with the machine gun; is that

right?

A    That is correct.

Q    And are people shot or do people get struck by bullets in the shootout?

A    Yes, two people.

Q    Okay.  Who's the first person?

A    Mr. Jordan, the Defendant.

Q    Okay.  And who is the second person?

A    An innocent bystander that was ordering food in McDonald's.

Q    Okay.  And what happens to the bystander who gets shot?

A    He passed away.

Q    And he gets killed by the gun, the machine gun that Mr. Ridge has; is that correct?

A    That's correct.

Q    Does Mr. Jordan get taken to a hospital after -- for being shot?

A    Yes, sir.

Q    And do Agents interview him?

A    Yes, sir.

Q    What does he initially say about his involvement in the shooting?

A    That he was at McDonald's, ordering some food and a fight broke out and he got shot in the process.

Q    All right.  So he denies any involvement?

A    That's correct.

Q    But then that's not true; is that right?

A    That's right.

Q    All right.  And what happens once he's confronted with what officers see on surveillance?

A    He admits to arriving at the McDonald's with the second group of individuals, and being a part of that altercation.

Q    All right.  And evidence that he intended to go in there to start the altercation; is that right?

A    That's correct.

Q    Do agents search his phone once they talked to him?

A    That's correct.

Q    And what do they see on the phone?

A    Multiple pictures and videos of firearms to include the one that was used inside the McDonald's.

Q    Okay.  Can you just describe for the Court the video that you see that -- with the firearm that you believe was the one used in the murder?

A    Yes, it's a video, I'm sorry, of Mr. Jordan holding a pistol in his hand with an extended magazine that has like a light fixture under it.  And in the video, the video is zoomed in so the back of the pistol where you can see a machine gun conversion device or it's also called a switch on the back of the gun.

Q    And what does a switch do?

A    A switch turns a semi-automatic firearm into a fully automatic firearm.

THE COURT:  Slow down.  Are you saying that -- I'm confused.  You're going way, way fast.

MR. TRAN:  Yes, Your Honor.

THE COURT:  You said there's a video of him in his phone of guns, and now you're -- are you talking about the gun you saw in his phone being at the scene?

MR. TRAN:  Yes, Your Honor.

THE COURT:  Okay.  Just go over that again for me, please.

MR. TRAN:  Yes, Your Honor.

BY MR. TRAN:

Q    So at this point, Mr. Jordan is in the hospital after being shot; is that correct?

A    That's correct.

Q    And officers review videos found on his phone?

A    That's correct.

Q    And on his phone, they see a video of him holding what they believe is the weapon used in the shooting; is that correct?

A    That's correct.

Q    And how do they match it up to the weapon being used in the shooting?

A    Based off of the features on the gun as far as, you know,

the extended magazine, black pistol, light fixture under it and then they asked Mr. Jordan about the gun, and Mr. Jordan admitted to that being the gun that was used in the McDonald shooting.

Q    So Mr. Jordan himself says the gun on his phone is the gun used at the shooting?

A    Yes.  And this particular video was taken like about two hours before the shooting happened.

Q    Okay.  And do you see other videos on his phone?

A    Yes.

Q    Can you describe one of those videos?

A    There's another video of Mr. Jordan driving a vehicle through an apartment complex it looks like where they're heard making threats, looking for certain individuals inside of that apartment, and holding multiple weapons in the video.

THE COURT:  Who was holding the weapons?

THE WITNESS:  There's three people in the video. Mr. Jordan was driving.  I don't -- I can't see who the actual people were.  It's the back of their heads.

THE COURT:  Okay.  Thanks.

BY MR. TRAN:

Q    But there's just multiple people holding guns, driving through an apartment complex; is that right?

A    That's correct.

Q    And they're all making threats about trying to find

people and that they're lucky those people aren't about because they might attack them?

A    That's correct.

Q    And are there other pictures on the phone showing Mr. Jordan with firearms?

A    That's correct.

Q    Now there's an issue with the first download of Mr. Jordan's phone; is that correct?

A    That's correct.

Q    And agents had to go out and try to find him again to re-download the phone?

A    Yes, sir.

Q    And what happened when agents were trying to find him the second time?

A    They called Mr. Jordan.  Mr. Jordan answered the phone. They said that they needed to speak with him again. Mr. Jordan said he was not home at the time and he would be back after 7:00 p.m.  After 7:00 p.m. came, they went to his house, called him.

The phone was now going straight to voicemail, not answering.  He's not at home.  They tried again the next day, phone is still going straight to voicemail and not answering. So they ended up writing a warrant for -- to get a ping for his phone.

Q    And where did they eventually find Mr. Jordan?

A    They found him at his girlfriend's house.

Q    And how far away is that from his home?

A    About like 40 miles, I believe, yeah, 40 miles, yes.

Q    And just based on the pattern of his phone being off and him not being home, what do officers believe he was intending to do?

A    He was tending to evade us since he knew that they were trying to meet with him that night.

Q    Okay.  And what happened when agents eventually got an arrest warrant and went to execute the arrest warrant?

A    When they went to execute the arrest warrant, Mr. Jordan provided the address that he was at, his father's residence. Harris County went to the residence and did a surrounding call out of Mr. Jordan.  Mr. Jordan did not initially come out.

Mr. Jordan called the lead investigator on the case and was trying to figure out what was going on.  Lead investigator stated that he needed to come outside, they need to arrest. He's saying he did not do it, I had nothing to do with this, and he's not coming out and hangs up the phone.

The lead investigator kept trying to call him to come outside.  He ended up getting up on the phone with Mr. Jordan again, and now Mr. Jordan is on the phone with his father as well so it's a three-way conversation.

And Mr. Jordan is saying I'm not -- I had nothing to do with this.  I'm not coming out.  He even states that he's

thinking about committing suicide instead of coming outside to the point where eventually Harris County ended up breaching the door and taking Mr. Jordan into custody.

Q    All right.  So taking a step back, did agents' investigation lead them to believe that Mr. Jordan knows where the firearm involved in that McDonald shooting is located?

A    That's correct

Q    Okay.  And what's that based on?

A    During the investigation, they were trying to locate Mr. Antone Ridge, the one that fired the weapon.  They found Mr. Ridge at an individual named -- I can't think of his first name but his last name is Lloyd, Mr. Lloyd.

Where they found -- I'm sorry, where they found Ridge at, they spoke to the owner of the residence and during that conversation, Mr. Lloyd said that when he came home, I believe it was March 17th, the day after the shooting, he heard Mr. Ridge on the phone with Mr. Jordan, and he knows it's Mr. Jordan because he knows Mr. Jordan's voice.

And he said that Mr. Lloyd said that Mr. Jordan stated that I got the blicky, and you don't have to worry about it. And so that leads us to believe that he knows where that firearm is at and still has not -- the weapon has still not been located to this day.

Q    Okay.  So just to clarify, Mr. Ridge was staying at Mr. Lloyd's house after the shooting?

A    That's correct.

Q    And then Mr. Lloyd tells officers that he heard Mr. Ridge and Mr. Jordan on the phone with each other?

A    That's correct.

Q    And on that phone call, Mr. Jordan tells Mr. Ridge, the shooter, I got the blicky, don't worry about it?

A    That's correct.

Q    And what is a blicky?

A    Based on my training and experience, a blicky is a firearm, like a gun.

Q    And this happened -- oh, and this is the day after the shooting; is that correct?

A    That's correct.

Q    And then based on this, agents believed that Mr. Jordan knows where the firearm involved in the shooting is located?

A    That's correct.

Q    And has Mr. Jordan told officers where the gun is?

A    No, he has not.

         MR. TRAN:  No further questions, Your Honor.  Pass the witness.

         THE COURT:  Cross?

         MR. GALLAGHER:  Thank you, Your Honor.

                        CROSS-EXAMINATION

BY MR. GALLAGHER:

Q    All right.  Just to clarify a few things, so first,

regarding the incident at McDonald's, you said Mr. Jordan was in the second group of three that had come in, correct?

A    That's correct.

Q    All right.  So the only person in that group who is seen with a firearm is Ridge, correct?

A    That's correct.

Q    And so no firearm or other weapons were observed in any of the videos you've seen with Mr. Jordan, right?

A    At the McDonald's, or --

Q    At the McDonald's?

A    At the McDonald's, no.

Q    Right.  Or in the hospital later?  Anything on that day --

A    No other videos of that day other than what was in his phone that --

Q    Right.  So that's previously to that day?

A    It was two hours before the McDonald's incident.

Q    Oh, the picture?

A    The video where the gun is -- well, I said it shows like the gun and then it zooms in on the back of the gun.

Q    Okay.

A    Yeah, that was the same day of the incident.

Q    And you said that during one of those interviews, I believe at the hospital, Mr. Jordan said that he went in with the others to get in an altercation with the crowd that was

already in there?

A    That's correct.

Q    But that's in reference to a fistfight which is in fact how the whole thing started, right?

A    That's correct.

Q    All right.  So did Mr. Jordan make any admission about they're expecting to be any gunfire, gun use that day, correct?

A    That's correct.

Q    Okay.  Regarding the video that was -- you described where Mr. Jordan is driving with other gentlemen in the car?

A    That's correct.

Q    All right.  So I think you said that was a full car, right, so it's a driver and three passengers?

A    To my knowledge, yes, I believe it was three passengers, two in the backseat and one in the front seat, yes.

Q    All right.  So when you said you saw firearms, you couldn't tell who had what, right?

A    Yes, I can't see their faces.

Q    Fine.

A    Except for Mr. Jordan.

Q    Well, we --

A    I'm sorry.  So you can see Mr. Jordan's eyes and the -- what's it called, the rearview camera.  That's how we knew it was Mr. Jordan driving.

Q    Fair enough, right.  So just to clarify, you could tell that Mr. Jordan was driving, right?

A    Yes, sir.

Q    But during that video, you can't see the driver with a firearm, right?

A    That's correct.

Q    When you see firearms, it's by the other three people in the -- some subset of the other three people in the vehicle, correct?

A    That's correct.

Q    All right.  So on the -- you talked about the day Mr. Jordan was arrested was July 29th, right?

A    Yes, sir.

Q    All right.  So -- and he was arrested at his house?  I mean his dad's house, right?

A    His dad's house, yes, sir.

Q    All right.  Which is an address where agents had previously known Mr. Jordan to be, right?

A    Yes, sir.

Q    All right.  So -- and they knew he was there because the day before, on the 28th, he reached out to your colleague, right?

A    Yeah, I believe it's the day -- yes, he did.  They were supposed to try to meet him at like a Popeye's or something like that.

Q    Right.  And then -- and this is -- Agent Hills is your colleague, right?

A    Yes, sir.

Q    All right.  So hold on, let me just make sure I was right.

A    And he's a task force officer, not an agent.  He's a task force officer with Harris County that basically works for the FBI -- if that makes sense.

Q    Okay.  That's fair.

A    Yeah.

Q    But he's essentially your colleague --

A    He's a colleague, yes, sir.

Q    -- in this investigation, fair enough?

A    Yes, sir.

        THE COURT:  Y'all just -- stop talking over each other.

        MR. GALLAGHER:  Oh.

        THE WITNESS:  Sorry.

        THE COURT:  And also you need to slow down because, you know, we're recording everything you say.  You're speaking very fast.  And you need to slow down in your answers.

        THE WITNESS:  Oh, I'm sorry.  I'm sorry.

BY MR. GALLAGHER:

Q    All right.  So okay.  So the day before, Mr. Jordan, Task Force Officer Hills had a communication where Mr. Jordan

agreed to meet up at a Popeye's, right --

A    Yes, sir.

Q    -- the following day?  And then the day after that is when with a warrant in hand, the agents went -- or the police, law enforcement went to his father's house in the area and ultimately arrested Mr. Jordan, right?

A    Yes, sir.

Q    All right.  And so you said they breached the house to ultimately make the arrest, right?

A    Yes, sir.

Q    And when Mr. Jordan is found, there's no firearm on him, right?

A    Not on him, no, sir.

Q    And there's no fight or flight by him, right?

A    No, sir.

Q    He didn't comply with the address to come out, but he didn't fight with any officers, didn't attempt to use any sort of weapon, correct?

A    That is correct.

Q    Right.  Oh, and actually -- sorry, just to be clear. Prior to that, on that morning, Task Force Officer Hills had actually received a text message from Mr. Jordan saying, hey, I'm at my dad's house in Katy, right?

A    Yes, sir.

Q    Okay.  So they were pretty certain they'd find him, and

in fact they did find him there?

A    Yes, sir.

Q    Okay.  And then -- so that was -- I'm sorry, when was the date of the McDonald's incident?

A    March 16th.

Q    Okay.  So it's about four months -- a little more than four months until Mr. Jordan was arrested in relation to this matter, right?

A    Yes, sir.

Q    Okay.  So in that time, was there any evidence of Mr. Jordan leaving the Greater Harris County area?

A    I don't know.

Q    But you don't know that?

A    I don't know the answer, sir.

Q    Nor any reports of him having a firearm or threatening anyone?

A    Not to my knowledge.

MR. GALLAGHER:  Okay.  Pass the witness, Your Honor.

THE COURT:  Any Redirect?

MR. TRAN:  No, Your Honor.

THE COURT:  May this witness be excused?

MR. GALLAGHER:  Yes, Your Honor.

MR. TRAN:  Yes, Your Honor.

THE COURT:  Thank you, sir.  You can --

THE WITNESS:  Thank you.

22

THE COURT:  -- step down.

(Witness steps down.)

THE COURT:  Mr. Tran, do you have any additional witnesses?

MR. TRAN:  No, Your Honor, just argument.

THE COURT:  All right.  Mr. Gallagher, do you have any witnesses?

MR. GALLAGHER:  No witnesses.  I have a very brief proffer.

THE COURT:  Okay.  You may proceed.

MR. GALLAGHER:  And it is just the Pretrial Report notes that they had been unable to make contact with Mr. Jordan's father.  I spoke with him yesterday evening and again just before Court.

He's apologized for not reaching out to Pretrial because he had a breakdown on his truck.  But he did confirm his residence and that Mr. Jordan is welcome to stay with him there if released on bond.

THE COURT:  Okay.  All right.  Argument, Mr. Tran?

MR. TRAN:  Yes, Your Honor.  Just to start, we'd ask the Court to take notice of the Pretrial Report.

THE COURT:  So noted.

MR. TRAN:  So Your Honor, on the danger to community, you know, this is -- I know he's charged with just possession of the machine gun, which I don't think there's any

23

dispute. He admits it.

The seriousness of this is the machine gun was used in a shootout that led to the death of an innocent bystander. And I know that defense had brought out the fact that he wasn't the person who had the gun during this altercation.

He held the gun two hours prior. He's been driving around with these individuals who are armed and he knew that they were armed, that they had these guns. And he went into that McDonald's knowing that a fight was going to happen.

We were seeing that on his phone he has social media posts of machine guns. There's pictures of him with machine guns and posing with guns. And so I think generally speaking there's this -- you know, he associates with dangerous illegal weapons.

And this ties into the risk of flight, but then he's not forthright with law enforcement. He knows that an innocent man -- and this didn't come out, but it was a 68-year-old grandpa who was shot -- and he lies to law enforcement about his involvement.

He knows where the murder weapon is. We believe he knows where the murder weapon is and he's hiding the murder weapon. When he first realized the officers were looking for him, he goes and turns off his phone and goes into hiding with his girlfriend.

And I recognize that he told officers where he was

staying at the time, but even though when they go and execute the search warrant, it becomes a hold up situation where they eventually have to knock down the door to go and execute the arrest.

And then as the probation report indicates, he has multiple offenses. They're misdemeanors, but he is on probation for a property theft, a felony crime. And this happened while he was on probation.

He's also convicted of misdemeanor evading arrest and a violation of protective order. So all that's to say, you know, one, he associates with dangerous and illegal weapons including driving around public spaces, looking for people, making threats.

And we know it's not just empty threats because he goes into the McDonald's to do this confrontation with his colleagues. He lies to law enforcement about his involvement, and he continues to lie about the location of a weapon that was involved in a murder.

And he has a history of ignoring and violating court orders including evading arrest, violating a protective order and again, he was on probation when this occurred.

That's it, Your Honor.

THE COURT:  Thank you.

Mr. Gallagher?

MR. GALLAGHER:  Yes, Your Honor.  I urge the Court

to set stringent conditions in this case. One point I do want to make clear is why -- obviously, Mr. Jordan has been indicted in this matter, so I'm not disputing the probable cause determination as that.

And the Government rightly summarizes the evidence as to the mere position of the firearm at issue. The evidence supporting that he lies about the location of the firearm is far less strong, and I don't think that's enough to make that finding by the Court.

This has come from an overheard phone call by someone whose hearsay statement, whose interest in this matter are unclear. And I don't think that's enough to support a finding that Mr. Jordan has been -- either knows about the location of the firearm currently, or at some point in the past, or is currently lying or continuing to lie about that.

I mean, stringent conditions would be appropriate. Such as Mr. Jordan recognizes that he has mental health issues and would think that mental health treatment would be appropriate as noted in the Pretrial Report, along with conditions of home detention with an ankle monitor to maintain -- that would suffice to protect the community from him.

As noted, he does have children, a child local as well as one who lives out of town, both of whom which he's involved, and that would allow him to maintain that and also

provide him incentive to comply with the orders of the Court.

His record doesn't show any -- he does have various misdemeanors as the Government and the one felony probation that the Government summarized.  But there's no evidence of him missing court appointments or missing court hearings.

And so the risk of flight is minimal, nor is there any evidence of permanent connections outside the local area to suggest that he would have any means of going anywhere.

So while there are weighty considerations that I think rightly would concern the Court, the Court has broad power to impose strong conditions that'll mitigate those, Your Honor.

THE COURT:  Thank you, Mr. Gallagher.

(Pause in the proceedings.)

THE COURT:  All right.  Mr. Jordan, the Government has requested or has moved that you be detained based upon 3142(f)(1) and (f)(2).  And the burden of proof is that there's clear and convincing evidence that there's no condition or combination of conditions to reasonably insure the safety of any other person or the community, or by a preponderance of the evidence that there are no conditions or combination of conditions that would reasonably assure your appearance as required.

Now the Court has considered the testimony as well as the Pretrial Services Report.  And in analyzing the factors

27

under 3142(g), the Court finds by clear and convincing evidence that there are no condition or combination of conditions to reasonably assure the safety of any other person or the community.

And finds by a preponderance of the evidence that there are no condition or conditions that would reasonably assure your appearance as required.  This is based on several factors including -- I'll first go over your criminal history.

You have several arrests, although some of these were dismissed:  A terroristic threat, deadly conduct, assault to a family member.  I know these were no billed and dismissed.

However, the video the Court has heard testimony on that you're driving around with other people with firearms, looking to attack somebody, as well as you violating a protective order, and the fact that you've admitted to possession of the machine gun that was used in this murder, as well as the multiple videos of you with firearms, concerns the Court to such an extent that the Court finds by clear and convincing evidence that there are no conditions to reasonably assure the safety of any other person or the community.

That in conjunction with the fact that officers had to breach the door to get you out to arrest you.

In addition, you have an evading arrest conviction in 2022.  You spent three days in jail.

28

Again, you have a violation of a protective order where you were convicted.

The Court also considers the juvenile criminal history in the Pretrial Report including --

MR. GALLAGHER:  Your Honor, I don't want to interrupt you.  You mind if we sit down while the Court explains its decision?

THE COURT:  No.  Yes, I'm sorry.  Yes, you can sit down.

MR. GALLAGHER:  You can have a seat.

THE COURT:  And which are listed in the Pretrial Report, including possession of a controlled substance, harassment, terroristic threat and indecency.  The Court has also considered the fact -- I know Mr. Gallagher stated that you spoke with the father and he said he could live with him.

But there is -- he had -- his father did not speak with Pretrial, and his -- the Defendant's personal history is uncorroborated.

In addition, the Court notes the Defendant has consistent use of drugs and appears to have mental health issues, as well.

The Court is also on notice from the Pretrial Report that you are currently on probation for a felony theft, and a motion to revoke is likely coming from the State Courts.

The Court will issue a written order, but for all

these reasons the Court then will order you detained pending further proceedings in this case.

Anything further?

MR. GALLAGHER:  Not from the defense.

MR. TRAN:  No, Your Honor, and thank you.

THE COURT:  Thank you.  You're excused.

(Proceeding adjourned at 11:06 a.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the Zoom/telephonic proceedings in the above-entitled matter.*

*/S./  MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #70269*

*DATE FILED:  DECEMBER 31, 2025*