**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 4:25-cr-336** |
| | § | |
| **TYLER JOHN JORDAN,** | § | |
| **Defendant.** | § | |

## GOVERNMENT'S TRIAL BRIEF

The Government submits this trial brief to provide the Court with an overview of the charges against the defendant, a summary of the relevant facts, the evidence the Government intends to present in its direct case, a legal overview of the charges against the defendant, and analysis of various evidentiary issues that may come up at trial. This is set for March 23, 2026.

### I.      Summary of Relevant Facts

The Defendant's possession of a machinegun charge stems from an investigation following the murder of an innocent bystander at a McDonalds located at 6110 North Fry Road, Katy, Texas. The shooting occurred on March 16, 2025 at approximately 5:30pm. The investigation revealed that the Defendant possessed the machinegun twice–once before the shooting and once after the shooting.

### A.  The March 16, 2025 Shooting

On March 16, 2025, the Defendant drove himself and two other individuals, Antoine Ridge and Tobias Johnson, to the McDonalds located at 6110 North Fry Road, Katy, Texas. The Defendant and Ridge entered McDonalds and left after getting some food. As they drove away, they saw another party drive up. Surveillance shows the Defendant, Ridge, and Tobias return to McDonalds to start a fight.

1

Tobias and the Defendant first entered, and Ridge followed in shortly after.  As Ridge entered, a person from the other group raised a firearm.  Ridge quickly pulled out a Glock pistol that was modified with a machinegun conversion device and rapidly fired 16 rounds into the crowded McDonalds lobby.  Three bullets from Ridge's gun struck and killed an innocent bystander. [1]  One bullet fired from the other individual struck the Defendant.

After being shot, the Defendant ran out of McDonalds to a nearby Waffle House. Surveillance shows the Defendant lying on the floor of the Waffle House and making phone calls. Tobias Jonhson then showed up, recovered car keys from the Defendant, and drove off with the Defendant's vehicle.  The investigation (including the Defendant's own admissions) later revealed that Johnson drove the vehicle to another residence, where he met Clarence and Terrance Earls (known as "The Twins").  The Twins then took the car from Tobias Johnson and brought it to Tyler Jordan's house.  In the early hours of March 17, 2025, officers observed the twins at the Defendant's house with the car.  Officers maintained surveillance on the car and later seized and searched it, pursuant to a warrant.

Meanwhile, immediately after the shooting, Ridge is observed on surveillance running away from McDonalds with gun in his hand.  Ridge then reappeared running towards the Defendant's vehicle, opened the front passenger door, rummaged for a second or two, then grabbed a bookbag and ran towards an open field.  Based on this video, officers believed at the time that Ridge had run into the field with the gun.  However, officers were unable to locate the firearm after conducting an extensive search of the nearby field.

The Defendant was brought to Ben Taub hospital to be treated.  While at Ben Taub, he was

---

[1] As discussed below, The Government does not intend to illicit testimony about the death, nor does the Government intend to publish video clips showing the bystander being shot, laying on the ground, or otherwise mention an injury other than the Defendant's injury.

interviewed by law officers numerous times.  He continuously lied about who he was with, who was involved in the shooting, why they fought, how they knew each other, what they were wearing, who took his car, and why the car was taken.  He eventually consented to have his phone searched, but he later confessed that he had already deleted messages to the shooter Ridge from his phone.

### B.  Jordan's First iPhone

Pursuant to the signed consent, officers performed a forensic extraction of the Defendant's first phone, an iPhone 15, with IMEI 353817901662171.

On the phone, they found a video of the Defendant holding the weapon used in the shooting. Notably, it was a Glock model pistol equipped with a machinegun conversion device (i.e., a "switch").  It also had a laser sight attachment and an extended magazine, which were observable on the video and in the McDonalds surveillance.  The metadata revealed that the video was taken at approximately 12:23pm on March 16, 2025—approximately five hours before the shooting.

When confronted with this video, the Defendant confessed to two different detectives that:

> (1) it was him holding the firearm in the video (which is confirmed by his distinctive hand tattoos);
>
> (2) the firearm belonged to Ridge; and
>
> (3) at the time he held the gun, he knew it had a "switch" on it and therefore knew it was a machinegun.

On this phone, officers also found messages where the Defendant was appearing to sell Glock pistols and several pictures and videos of the defendant and his colleagues with other firearms.

Also on the phone were text messages and system notifications with Ridge (saved in the contacts as "Twan"), despite the Defendant repeatedly telling officers that he did not know Ridge

well, did not have Ridge's number saved, and only contacted Ridge through Instagram. When officers confronted the Defendant about missing Instagram messages on the day of the shooting and thereafter, the Defendant confessed that he had deleted messages and call logs.

### C. Jawara Lloyd Overhears the Defendant Confessing to Hiding the Gun

At the time of the shooting, Ridge was staying at the residence belonging to Mr. Jawara Lloyd. Mr. Lloyd had known both Jordan and Ridge for years. Ridge was a close friend of Mr. Lloyd's son, and they had known each other for approximately 10 years. The Defendant worked at a "Slim Chickens" restaurant that Mr. Lloyd was the manager of for approximately a year.

After Ridge was arrested on March 20, 2025, officers interviewed Mr. Lloyd. Mr. Lloyd confirmed that Ridge stayed at his house from about March 14 or March 15 through March 20.

Mr. Lloyd told officers that on the afternoon of March 16, 2025, he had taken his wife to an overnight medical procedure. When he returned early morning of March 17, 2025, around 5:00 or 5:30am, he saw Ridge pacing up and down the driveway. Ridge was on a call, using the speakerphone feature, with someone he recognized to be the Defendant. Mr. Lloyd knew the Defendant's voice well from working with him four to five days a week for a year, and he knew what the Defendant sounded like over the phone because the Defendant would call in sick. Mr. Lloyd heard the Defendant say "man, I got that blickey . . . I got that blickey put up." Mr. Lloyd knew and understood the word "blickey" to be slang for a gun. Given the fact that the Defendant and Ridge were talking about a gun less than a day after the shooting, the Government asserts that the Defendant was telling Ridge that he has hidden the machinegun used in the shooting.

### D. Jordan's Second iPhone

During the course of the investigation, officers also seized and searched the Defendant's second phone, an iPhone 13 with IMEI 350776590785698. This phone was in the Defendant's

vehicle when the vehicle was towed.

On the Defendant's second phone, officers found calls and text messages with Ridge (again, despite him telling officers that he did not have Ridge's phone number), internet searches related to Glock pistols and "switches" (i.e., machinegun conversion devices), browser history corresponding to news articles discussing federal prosecution of switches and machinegun conversion devices, and at least eight photos of firearms including photos of the defendant holding a firearm.

## II.     Charges Against the Defendant

The indictment ("indictment"), returned on June 24, 2025, charges the Defendant with one count of Possession of a Machinegun, in violation of 18 U.S.C. § 922(o)(1), and one count of Possession of an Unregistered Machinegun, in violation of 26 U.S.C. § 5861(d).  The Government intends to dismiss Count 2 at the pretrial conference and only proceed with Count One at trial. Counsel for defense was notified via email on March 9, 2026.

For machinegun related charges, the Government must prove beyond a reasonable doubt that the Defendant "knew [the firearm] was a machinegun or was aware of the firearm's essential characteristics that made it a machinegun."  *See, e.g.*, Fifth Circuit Pattern Jury Instructions, § 2.43I; *see also Staples v. United States*, 511 U.S. 600, 619 (1994) (holding the Government must prove that the Defendant knew the automatic weapon was a "firearm" within the meaning of the National Firearms Act); *United States v. Anderson*, 885 F.2d 1248, 1250 (5th Cir. 1989) (same).

That is, to convict the two machinegun charges, the Government must show both: (1) that the firearm he possessed operated as a machinegun, and (2) that the Defendant *knew* that the firearm was a machinegun.

5

As noted above, the charges arise from two separate instances of possession.  The first is from the video where the defendant is seen possessing the firearm.  The second arises from the Defendant's orchestration through Johnson, Clarence Earls, and Terrance Earls to hide the gun after the shooting.  This second possession will be proven through a theory of "constructive" possession.  That is, even if the Defendant did not have direct access to the gun (because he was in the hospital and the vehicle was towed by law enforcement), as he was laying on the ground bleeding at the Waffle House, he knew to prioritize calling three people to pick up his car from the crime scene.  This was an intentional act to help dispose of the weapon used in the shooting.  And only a few hours after he returned home from the hospital, around 5:00 or 5:30 in the morning, he called the shooter Ridge to confirm that the firearm had been hidden.

### III.     Anticipated Testimony and Evidence

To meet its burden, the Government intends to introduce testimony from seven witnesses, including a crime scene investigator, detectives, a firearm expert, and a lay fact-witness.  The Government also anticipates entering approximately 50 exhibits into evidence as part of its case-in-chief, including photographs, surveillance video, cellular phone video, and segments of recorded interviews.  There will be some natural overlap in these categories.

The following is an overview of the testimony the Government anticipates each witness will provide.

(i)     <u>Jesus Ortiz</u>: Deputy Ortiz has been a certified peace officer since 1991 and is in the crime scene investigation unit. He is familiar with investigations and preservation of evidence. Deputy Ortiz Arrived on scene to respond to the March 16, 2025, shooting at McDonalds. Deputy Ortiz provides the initial link in the chain of custody for the recovered fired bullet casings, which are later analyzed by Raquel

Pipkin. Deputy Ortiz also reviewed security videos and assisted in the expansion of the scene to canvass for more evidence in surrounding fields. When viewing the security videos, through his training and experience, which involves handling weapons, firing weapons, specific training involving machineguns, in his opinion he believes the gun fired by Antoine Ridge was a machinegun.

(ii)    Matthew Curry: Detective Curry is assigned to the homicide division with the Harris County Sheriff's Office. Detective Curry interviewed the Defendant and conducted an extraction of his first phone. After the extraction, Detective Curry manually reviewed the phone and located a video of Jordan holding a gun that the detective recognized to be equipped with a machinegun conversion device, i.e., a "switch." When he returned the cellular phone to the Defendant, Detective Curry interviewed Jordan again and confronted him about the video of him holding the gun with the switch. The Defendant confirmed that it was him holding the gun, and that he knew it had a switch. Detective Curry relayed this information to Detective Hilz.

(iii)   James Everman: Firearms Enforcement Officer James Everman is employed by the ATF and has specific training and experience regarding firearms. He has reviewed, among other things, video of murder weapon and McDonalds surveillance videos. Based on his review of the videos, Agent Everman confirmed the make and model of the firearm, the caliber of the bullets used in the weapon, and that the weapon operated as a machinegun.

(iv)    Jawara Lloyd: Mr. Lloyd has known the Defendant and Antoine Ridge for years. Ridge was Mr. Lloyd's son's childhood friend. Mr. Lloyd was the Defendant's

supervisor at a "Slim Chickens" restaurant for approximately one year, and he worked with the Defendant four to five times a week during this time.  Mr. Lloyd also described Jordan to talk about guns a lot at work and described him as "a gun fanatic."  Around the time of the shooting, Ridge was evicted from his housing and came to stay with Mr. Lloyd and his wife. On the evening of March 16, 2025, Mr. Lloyd took his wife to an overnight medical procedure. When Mr. Lloyd got returned home around 5:00 or 5:30am, he saw Ridge on the phone pacing up the driveway. Mr. Lloyd heard the voice on the speaker phone and recognized that voice as the Defendant's. Mr. Lloyd overheard the Defendant saying to Ridge, "Man I got that 'blickey', … don't worry about this." A "blickey" is slang for a "firearm" or "gun."

(v)    <u>Raymundo Buenrostro</u>: Detective Buenrostro is a detective with Harris County Sheriff's Office homicide division. Detective Buenrostro conducted portions of the homicide investigation, including retrieving surveillance footage, searching for the firearm, and making the scene.

(vi)   <u>Wendy Gonzalez</u>: Detective Gonzalez is a detective with Harris County Sheriff's Office homicide division. Detective Gonzalez was the lead detective on the homicide portion of the investigation. While there is overlap in the investigation, she can provide firsthand knowledge of actions taken during the larger investigation.

(vii)  <u>Ryan Hilz</u>: Detective Hilz is a detective with the Harris County Sheriff's Office and a Task Force Officer with the FBI.  He is the lead case agent on the federal case. Detective Hilz will provide testimony about all aspects of the investigation,

including portions of the investigation that he conducted personally and steps performed by other law enforcement officers. He also interviewed the Defendant numerous times and will provide direct testimony on those interviews.

## IV.    Evidentiary Issues

Several evidentiary issues that may arise during trial involve application of the hearsay rules. The Government summarizes these issues below.

### A.    Statements of the Defendant

The Government intends to introduce statements made by the Defendant in a non-custodial interview. Such statements are admissions of a party opponent and are excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A). Therefore, these statements are not subject to the bar on hearsay.

### B.    Defendant May Not Offer His Own "Self-Serving" Hearsay Statements

The Government will not seek to introduce every statement the Defendant has made. If the Defendant wishes to put the factual claims underlying those statements before the jury, he certainly can do so by testifying. However, he cannot avoid cross-examination by simply introducing his prior statements. To the extent the Defendant may seek to offer his own out-of-court statements, those statements remain inadmissible hearsay pursuant to Rule 801(d)(2), which excludes from the definition of hearsay only the statements of a party that are offered *against* that party. *See* Fed. R. Evid. 801(d)(2); *see, e.g.*, *United States v. Branch*, 91 F.3d 699, 729 (5th Cir. 1996).

This is true even if the Defendant's self-serving statements in the excluded portions are less incriminatory or even would exculpate the Defendant were the jury to believe them. *See Williamson v. United States*, 512 U.S. 594, 599 (1994) (non-self-inculpatory statements are

9

inadmissible, even if they are made within a broader narrative that is generally self-inculpatory); *United States v. Crinel*, No. 15-61, 2016 WL 6551249, at *2 (E.D. La. Nov. 1, 2016) (stating that courts have "made clear that out-of-court exculpatory statements made by the defendant are inadmissible even if the exculpatory statement is made in tandem with a statement that is admissible under one of the hearsay exceptions").

Federal Rule of Evidence 106, referred to as the "Rule of Completeness" does not change this conclusion. Rule 106 states that "if a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Yet, Rule 106 only allows the Defendant "to correct an incomplete and misleading impression created by the introduction of part of a writing or recorded statement." *United States v. Herman*, 997 F.3d 251, 264 (5th Cir. 2021). As such, "Rule 106 only allows the admission of portions that are 'relevant and necessary to qualify, explain, or place into context the portion already introduced.'" *United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996)); *see also Williamson v. United States,* 512 U.S. 594, 599 (1994) ("[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts [which are hearsay]".

Although Rule 106 refers broadly to "fairness," the Fifth Circuit has cautioned that this "does not permit a party to introduce writings or recorded statements to affirmatively advance their own, alternative theory of the case." *Herman*, 997 F.3d at 264. Nor does "fairness" allow the Defendant to admit the exculpatory, self-serving statements he made during an interview just because the government is admitting his other, more incriminating statements made during the same interview. As the Fifth Circuit succinctly explained: "We do not doubt the exculpatory

nature of the excluded statement, but that does not require its admission under Rule 106." *Branch*, 91 F.3d at 728.   As such, if the Defendant attempts to admit a portion of his interview with police, he should be strictly required to show why his proposed excerpt is both 'relevant and necessary to qualify, explain, or place into context the portion already introduced' by the Government.  *Id*.

### C.  *Statements Not Offered for the Truth of the Matter Asserted*

The Government will, at times, offer testimony not for the truth of the matter asserted, but for other relevant evidentiary purposes.  Such testimony is not considered hearsay.  *See United States v. Parry*, 649 F.2d 292, 295 (5th Cir. 1981) ("Using an out-of-court utterance as circumstantial evidence of the declarant's knowledge of the existence of some fact, rather than as testimonial evidence of the truth of the matter asserted, does not offend the hearsay rule."); *see also* Fed. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Out-of-court statements offered for the limited purpose of providing background information or explaining why a testifying witness did something (state of mind evidence such as motive or bias) is similarly not hearsay.  *United States v. Gentle*, 361 F. App'x 575, 580-81 (5th Cir. 2010).  The Government intends to elicit such testimony during trial.

### D.  *Use of Demonstrative Evidence and Subtitled Audio*

The Government intends to present one or more demonstrative aids (i) maps, (ii) replica "switch", (iii) subtitled audio recordings and (iv) timelines. Such aids are permissible, subject to regulation under Federal Rule of Evidence 611(a).  Given the technical nature of the machine gun conversion device ("switch"), demonstrative aids are a reasonable and routinely admissible tool to aid the trier of fact. The use of charts as "pedagogical devices intended to present the government's version of the case" is within the bounds of the trial court's discretion to control the presentation

of evidence under Rule 611(a). *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000). Demonstrative aids are permissible to assist the jury in evaluating the evidence if the jury is warned beforehand that the charts are not independent evidence. *Id.* Moreover, under Federal Rule of Evidence 1006, summary charts based on evidence so voluminous that in-court review by the jury would be inconvenient may even be admitted into evidence. *Id.*

### E. Subtitled Audio Does Not Violate Best Evidence Rule (FRE 1002)

Generally, "[a]n original…recording…is required to prove its contents unless these rules or a federal statue provides otherwise. *See* Fed R. Evid. 1002. The Government will be offering transcribed audio as an aid to the jury. The Government will not be offering transcripts in lieu of the original recording. As such, the Government's approach does not run afoul of Federal Rule of Evidence 1002. *See United States v. Thompson*, 482 F.3d 781 (5th 2007) (stating that the trial court, in its discretion, may allow the use of a transcript "to assist the jury as it listens to the tape"); *United States v. Valadez*, 186 Fed. Appx. 508, 511 (5th Cir. 2006) ("The tape recording was properly admitted as the best evidence of the conversations ..., and the transcript of that tape was properly admitted for jurors to use as an aid to understand the tape."). Moreover, should counsel for defense take issue with the accuracy of portions of the subtitled audio, the remedy is not exclusion, but rather, allowing defense the opportunity to submit a transcript containing its version of the conversation. *United States v. Chaney*, 299 Fed. Appx 447, 453-54 (5th Cir. 2008) (citing *United States v. Wilson*, 578 F.2d 67, 70 (5th Cir.1978)).

### V.    Motions in Limine, Other Motions, and Stipulations

The following is a list of pending motions and stipulations before the Court.

The Government has filed the following motions:

- Dkt. 29 – Opposed Motion in Limine to Preclude Defendant from Defining

Reasonable Doubt at Trial.  The Defendant filed a response at Dkt 32.

- Dkt 30 – Opposed Motion in Limine to Exclude Expert Testimony of Darek Pleasants.  The Defendant filed a response at Dkt 41.

- Dkt 31 – Opposed Motion in Limine to Preclude Improper Impeachment Evidence.  The Defendant filed a response at Dkt. 37.

The Defendant has filed the following motions:

- Dkt. 34 – Motion to Avoid Double Jeopardy Violation.  As noted above in footnote 2, the Government will move to dismiss Count 2, so this motion is moot. Defense was notified via email.

- Dkt. 35 – Motion in Limine to Exclude Evidence of Defendant's Criminal History Under Rule 609.  The Government filed a response at Dkt. 44.

- Dkt. 36 – Motion in Limine to Exclude Evidence of Gang Affiliation.  The Government filed a response at Dkt. 46.

- Dkt. 37 – Motion in Limine to Exclude Testimony of Jawara Lloyd.  The Government filed a response at Dkt. 47.

- Dkt. 39 – Opposed Motion in Limine to Exclude Photographs of Defendant Holding Firearms.  The Government filed a response at Dkt. 45.

- Dkt. 40 – Unopposed Motion in Limine: *Murder Investigation*

- Dkt. 51 – Motion in Limine to Exclude Expert Testimony by Law Witnesses

The parties have agreed to two factual stipulations:

- Firearm Examiner Raquel Pipkin of the Houston Forensic Science Center "was asked to examine, among other things, sixteen (16) 10mm cartridge casings recovered from the scene," and that, "Examination of the 10 mm cartridges

13

revealed that they could have been fired from a Glock brand of 10mm Auto semi-automatic pistol."

- Forensic Chemist Brittany S. Claassen of the Houston Forensic Science Center "was asked to examine a gunshot residue kit from the defendant Tyler Jordan, labeled as his right and left hands," and "[e]xamination of the gunshot residue kit revealed no particles having a composition characteristic with gunshot residue."

Respectfully submitted,

**JOHN G.E. MARCK**
Acting United States Attorney

*s/ Anh-Khoa T. Tran*
Anh-Khoa T. Tran
Assistant United States Attorney
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Tel: (713) 567-9551
anh-khoa.tran@usdoj.gov

Charles Hagerman
Assistant United States Attorney
1000 Louisiana Street, Suite 2300
Houston, TX 77002
Tel: (713) 567-9514
charles.hagerman@usdoj.gov

14

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Government's Trial Brief

was sent via ECF to the defendant's attorney on March 18, 2026.

*s/ Anh-Khoa T. Tran*
Anh-Khoa T. Tran
Assistant United States Attorney
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Tel: (713) 567-9551
anh-khoa.tran@usdoj.gov